### In re GUARDIANSHIP OF THOMAS, Appellant;
### Jenkins, Appellant; Espy, Appellee.

[Cite as *In re Guardianship of Thomas*, 148 Ohio App.3d 11, 2002-Ohio-1037.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–448.

Decided Mar. 12, 2002.

12

Fry, Waller & McCann Co., L.P.A., and Barry A. Waller, for appellee Eloise Thomas.

Ricketts & Onda Co., L.P.A., and Charles H. Lease, for appellant Leroy Jenkins.

Vorys, Sater, Seymour & Pease L.L.P., Robert G. Dykes and Alan T. Radnor, for appellee Ben Espy.

Michael Kirkman and Cynthia A. Yost, for amicus curiae Ohio Legal Rights Service.

---

DESHLER, Judge.

{¶ 1} This case is before this court upon separate appeals filed by Eloise Thomas ("Thomas") and Leroy Jenkins ("Jenkins") from a judgment of the Franklin County Court of Common Pleas, Probate Division, appointing appellee, Ben Espy, as guardian of the person and estate of Thomas, and revoking a power of attorney granted by Thomas.

{¶ 2} On January 11, 2001, S. Brewster Randall II ("Randall"), an attorney, filed an application for appointment of guardian, alleging that Thomas was incompetent. Also on that date, Randall filed a motion for temporary restraining order, seeking to restrain the removal or liquidation of any financial assets in

Thomas's name. The trial court subsequently granted the motion for temporary restraining order, and the court set a hearing date for February 12, 2001, on the application for appointment of guardian. By entry filed February 1, 2001, the trial court granted an application for continuance of the hearing, and the court rescheduled the hearing date for March 5, 2001.

{¶ 3} On February 1, 2001, the trial court appointed Dr. Ronald Moomaw, D.O., as an expert on behalf of the court to conduct a psychological examination of Thomas. On February 26, 2001, Dr. Moomaw completed a "statement of expert evaluation" in which he concluded that Thomas was mentally impaired. More specifically, Dr. Moomaw stated in the evaluation:

{¶ 4} "Mrs. Thomas Jenkins has a moderate dementia that has impaired her ability to make sound judgements [sic]. She lacks the ability to think abstractly, has a poor general fund of knowledge, lacks concentration, has significant deficits in memory, and is extremely vulnerable. This is demonstrated not only in the clinical interview but is evident in the MMSE [Mini Mental Status Exam] with a score of 17 of a possible 30."

{¶ 5} The trial court also appointed an investigator, Eric Horvath, to the case. Horvath filed a report with the court, stating his belief that the appointment of a guardian was in Thomas's best interest, and recommending that Randall be appointed as her guardian. In his report, Horvath stated that he had visited Thomas on two separate occasions, and he noted that Thomas was at times "easily distracted and lost her concentration," and that she was "forgetful and disoriented to time."

{¶ 6} By entry filed February 21, 2001, "[p]er agreement of the parties," the trial court continued the hearing previously set for March 5, 2001, until March 12, 2001. On February 28, 2001, Mary Drakeford filed an application for appointment of guardian. On March 6, 2001, counsel for Thomas filed a motion to continue the hearing "to permit [Thomas] to obtain a complete evaluation from Grant/Riverside Hospital and to submit evidence of an independent medical evaluation." By entry filed March 12, 2001, the trial court denied Thomas's motion to continue the hearing.

{¶ 7} On March 9, 2001, Jenkins filed an application for appointment of guardian. The matter came for hearing before the court on March 12, 2001, on the applications for guardianship filed by Randall, Drakeford, and Jenkins. At the beginning of the hearing, counsel for Thomas renewed the motion for a continuance, "based upon the need for Dr. Evans to complete his evaluation at the Gerlach Center at Riverside Hospital." The court declined to grant a continuance, indicating that it had previously given its reasons for denying the motion.

{¶ 8} The trial court, by entry filed March 16, 2001, found by clear and convincing evidence that Thomas was incompetent. The trial court's entry included the following factual findings. Thomas, age seventy-six, was previously married to Roy Thomas, who died December 27, 2000. In 1992, Thomas and her husband Roy won the Ohio State Lottery. On November 28, 2000, Thomas executed a durable power of attorney, naming Mary Drakeford and Jenkins as joint attorneys-in-fact. Over the years, Thomas and her husband Roy had periodically been members of Jenkins's evangelistic church. On January 12, 2001, Jenkins and Thomas were married in Las Vegas, Nevada.

{¶ 9} Dr. Moomaw, the expert appointed by the court to conduct a psychological examination of Thomas, testified at the hearing that Thomas suffers from moderate dementia, and that she will not improve in the future. Dr. Moomaw opined that Thomas fits the statutory definition of an incompetent individual. Dr. Moomaw expressed particular concern regarding Thomas's serious deficits in memory, including the fact that she could not remember her own age, the correct number of her brothers and sisters, the date of her husband's death, the date of her recent marriage to Jenkins, or the sum of money she won in the lottery.

{¶ 10} The court also heard testimony from a number of other witnesses, including Jenkins, Janet Ringley, a trust officer at National City Bank, Deborah Hargrave–Turner, a former neighbor of Thomas, Delaware Police Officer Mark Drum, and Mary Drakeford, a sister of Thomas.

{¶ 11} In its entry, the court concluded that, "[a]s a result of Eloise's wealth, it appears Jenkins has attempted to gain a proprietary interest in Eloise's affairs as evidenced by his stealth marriage to Eloise, referring all Eloise's matters to his attorney, and having Eloise execute a Power of Attorney nominating him as co-attorney-in-fact." The court appointed appellee Espy as guardian of the person and estate of Thomas, and the court also ordered the revocation of the power of attorney granted by Thomas and executed November 28, 2000.

{¶ 12} On April 13, 2001, Jenkins filed a notice of appeal from the trial court's entry. On April 16, 2001, Thomas filed an appeal from the court's entry. On appeal, Thomas asserts the following three assignments of error for review:

## ASSIGNMENT OF ERROR NO. 1

{¶ 13} "The trial court abused its discretion and committed reversible error in failing to grant cross-appellant's motion for continuance effectively denying cross-appellant the right to an independent expert evaluation pursuant to R.C. § 2111.02(C)(7)(c)."

**16**

{¶ 14}  "The appointment of a guardian over cross-appellant's person and estate was not supported by clear and convincing evidence as the least restrictive alternative available to protect cross-appellant consistent with her needs."

### ASSIGNMENT OF ERROR NO. 3

{¶ 15}  "The trial court erred in finding that a guardianship was necessary."

■  {¶ 16}  Under his appeal, Jenkins sets forth the following three assignments of error:

{¶ 17}  "I.  The trial court erred when it revoked the November 28, 2000 durable power of attorney executed by Eloise Thomas, which appointed appellant as guardian of Eloise Thomas, when it determined that Eloise Thomas was incompetent at the time Eloise Thomas executed the November 28, 2000 durable power of attorney.

{¶ 18}  "II.  The trial court erred when it admitted hearsay evidence, specifically a November 28, 2000 letter from Daniel K. Balaloski, and barred the testimony of appellant's witnesses relating to the competency of Eloise Thomas on November 28, 2000, the date the durable power of attorney was executed by Eloise Thomas, appointing appellant as guardian over Eloise Thomas.

{¶ 19}  "III.  The trial court erred when it denied appellant's application for guardianship, which requested guardianship over the person, Eloise Thomas, only."

{¶ 20}  We will initially address the first assignment of error of appellant Thomas, under which it is asserted that the trial court erred in failing to grant Thomas's motion for a continuance.

{¶ 21}  As noted under the facts, Randall filed an application for appointment of a guardian on January 11, 2001, and the court filed an entry setting a hearing date for February 12, 2001.  On February 1, 2001, the trial court granted a continuance and set a new hearing date for March 5, 2001.  Also on February 1, 2001, the trial court, on its own motion, appointed Dr. Moomaw to conduct an examination of Thomas.  On February 21, 2001, the court again continued the hearing "[p]er agreement of the parties," setting a new hearing date for March 12, 2001.

{¶ 22}  On March 6, 2001, counsel for Thomas filed a motion requesting that the hearing scheduled for March 12, 2001, be further continued in order to permit Thomas to "obtain a complete evaluation from Grant/Riverside Hospital and to submit evidence of an independent medical evaluation."  In the accompanying memorandum, counsel for Thomas indicated that examining physician Dr. Mark

Evans had met with Thomas on February 6, 2001, and Dr. Evans had recommended additional testing by another physician, Dr. Bain, at Grant/Riverside Hospital. The memorandum further stated that Dr. Bain had advised counsel that his report would not be available until April 19, 2001. In support of the motion, Thomas cited R.C. 2111.02(C)(7)(c).

{¶ 23} By entry filed March 12, 2001, the trial court denied the request for a continuance, stating, in relevant part:

{¶ 24} "This matter has come before the Court upon Eloise Thomas NKA Eloise Thomas Jenkins' Motion to Continue Hearing scheduled March 12, 2001.

{¶ 25} "The Court finds that this hearing has previously been continued from February 12, 2001 to March 12, 2001 to allow for the completion of an independent evaluation by the Movant. Two (2) months have passed since the filing of the guardianship application by S. Brewster Randall, II. The Court finds that adequate time has been allowed to complete all necessary medical evaluations. The requested continuance would be an undue delay, which would outweigh the probative value of a continuance and be against the best interests of Eloise Thomas * * *."

{¶ 26} On appeal, Thomas contends that the trial court's failure to grant the continuance amounted to a denial of her statutory right to an independent medical examination. Thomas relies upon R.C. 2111.02(C)(7), which states in part as follows:

{¶ 27} "(C) Prior to the appointment of a guardian or limited guardian under division (A) or (B)(1) of this section, the court shall conduct a hearing on the matter of the appointment. The hearing shall be conducted in accordance with all of the following:

{¶ 28} "* * *

{¶ 29} "(7) If the hearing concerns the appointment of a guardian or limited guardian for an alleged incompetent, the alleged incompetent has all of the following rights:

{¶ 30} "(a) The right to be represented by independent counsel of his choice;

{¶ 31} "(b) The right to have a friend or family member of his choice present;

{¶ 32} "(c) The right to have evidence of an independent expert evaluation introduced;

{¶ 33} "(d) If the alleged incompetent is indigent, upon his request:

{¶ 34} "(i) The right to have counsel and an independent expert evaluator appointed at court expense;

{¶ 35}  "(ii) If the guardianship, limited guardianship, or standby guardianship decision is appealed, the right to have counsel appointed and necessary transcripts for appeal prepared at court expense."

{¶ 36}  At the outset, we observe that the instant case does not involve the trial court's denial of a motion to request appointment of an independent expert. As noted under the facts, the court appointed an independent expert, Dr. Moomaw, to evaluate Thomas.  While Thomas acknowledges that the trial court had medical evidence before it on the issue of incompetency, Thomas argues that the continuance was necessary because her own medical expert, Dr. Evans, had recommended additional testing by another physician, Dr. Bain. Thomas contends that the trial court's denial of her motion for a continuance effectively deprived her of the opportunity to obtain an independent expert of her own choice, a right, Thomas maintains, that is guaranteed by R.C. 2111.02(C)(7)(c).

{¶ 37}  We note that R.C. 2111.02 was amended in 1990 to specifically provide an alleged incompetent with the rights set forth under subsection (C)(7).  While we lack legislative history concerning the amendment of the statute, in a case predating the statute, *In re Guardianship of Corless* (1981), 2 Ohio App.3d 92, 2 OBR 104, 440 N.E.2d 1203, the court set forth minimum procedural requirements in cases involving appointment of a guardian.  Those requirements included, in cases in which the application for appointment of a guardian is contested, "as a minimum, one medical examination of the proposed ward conducted by an independent source *appointed by the court.*"  (Emphasis added.)  Id. at 96, 2 OBR 104, 440 N.E.2d 1203.  The court in *Corless* noted that, under Ohio law, guardianship proceedings are not adversarial in nature, as "such proceedings are, in theory, in the best interests of the proposed ward."  Id. at 95, 2 OBR 104, 440 N.E.2d 1203.  However, the court also noted that the imposition of an involuntary guardianship should be treated in a serious manner, and the court determined that a medical examination of the proposed ward by an independent source appointed by the court satisfied the need "to insure some independent, unbiased evidence of the proposed ward's mental condition."  Id. at 96, 2 OBR 104, 440 N.E.2d 1203.

{¶ 38}  In considering the specific statutory language at issue, although R.C. 2111.02(C)(7)(c) clearly contemplates that the alleged incompetent has the right to have evidence of an independent expert evaluation introduced, the statute is not so clear as to whether that right requires an independent expert evaluator of the alleged incompetent's choice.  We note that, under R.C. 2111.02(C)(7)(a), the alleged incompetent is afforded the right to be represented by independent counsel "of his choice," and that, similarly, under R.C. 2111.02(C)(7)(b), the alleged incompetent is afforded the right to have a friend or family member "of his choice" present.  However, R.C. 2111.02(C)(7)(c) does not contain the phrase

"of his choice" with respect to the requirement of an independent expert evaluation. Arguably, had the legislature intended that the alleged incompetent be afforded the right to present evidence of an independent expert of his or her choice, it could have easily expressed this by employing the same or similar language used in the immediately preceding subsections. Since it did not, we may presume that the legislature omitted the phrase "of his choice" from subsection (C)(7)(c) because it was not what it intended.[1]

{¶ 39} Even assuming, arguendo, that we were to construe the language of R.C. 2111.031 to hold that a court-appointed expert evaluator did not satisfy the requirements of the statute, we would not find that the actions of the trial court resulted in reversible error under the facts of this case. As previously noted, the trial court did not deny a motion to appoint an expert of Thomas's own choice; rather, the court denied a motion for continuance. As also noted, Dr. Evans, a physician of Thomas's own choice, examined Thomas prior to the hearing, but counsel for Thomas, apparently for reasons of trial strategy, declined to present the physician as a witness. Appellee argues that counsel for Thomas was free to admit evidence of their retained expert but chose not to do so because that expert found, as did the court-appointed expert, that Thomas was incompetent and confused. Appellee further maintains that the facts indicate that the requested continuance was unrelated to the issue before the trial court. Specifically, appellee contends that the continuance was requested in order to obtain evidence concerning the issue of Thomas's possible future competency, i.e., whether her condition was temporary or permanent in nature. Upon review, we find that the record supports appellee's contention.

{¶ 40} We note that Dr. Evans, following his evaluation of Thomas, prepared a report that the trial court reviewed in camera prior to the trial. The report contained a section titled "IMPRESSION," in which Dr. Evans indicated "[d]ementia with a mini-mental status score of 18/30 [sic]." In the report, Dr. Evans stated in part, "I told Mr. Jenkins that if we were to declare her, based upon the test results we had today, that I would probably declare her incompetent due to her low mini-mental status examination of 18/30, * * * and given her poor cognition and specificity in answering questions today." Under a section titled

---

1. Thomas notes that another statutory provision provides the trial court with the authority to order a medical evaluation. Specifically, R.C. 2111.031 states in part that, "[i]n connection with an application for the appointment of a guardian for an alleged incompetent, the court may appoint physicians * * * to examine * * * the alleged incompetent, to assist the court." Thomas contends that the right under R.C. 2111.02(C)(7)(c) is separate and distinct from the provision under R.C. 2111.031. We would only note that the language of R.C. 2111.031 is discretionary; thus, in instances in which the court may choose not to appoint a physician to conduct an examination, an alleged incompetent would still have the opportunity to request evidence of an independent expert evaluation under R.C. 2111.02(C)(7)(c).

"PLAN," Dr. Evans proposed to have Dr. Bain interview Thomas "to evaluate her psychological testing." Dr. Evans also proposed "[a]ssessing any irreversible changes of dementia," i.e., a CAT scan. Dr. Evans stated in the report that, upon return of these tests, further assessment would be performed "to see if this would be a temporary incompetency or something that looks more on the permanent level."

{¶ 41} As noted by appellee, the issue before the trial court was not whether Thomas's incompetency was temporary, but, instead, whether Thomas was presently incompetent and in need of a guardian. Thus, the fact that further testing may have shed light on whether Thomas's condition was temporary or permanent does not provide a basis for finding that the trial court abused its discretion in denying the motion for continuance. Further, two prior continuances had previously been granted (including one request involving counsel for Thomas) and, at the time of counsel's request for a further continuance, two months had passed since the filing of the guardianship application by Randall. Here, the trial court determined that adequate time had been afforded the parties to complete all necessary medical evaluations and that further delay of the matter would be adverse to the best interests of Thomas. In general, "[t]he decision to grant a continuance is entrusted to the sound discretion of the trial court." *Henson v. Highland Dist. Hosp.* (2001), 143 Ohio App.3d 699, 704, 758 N.E.2d 1166. A trial court's decision denying a continuance should not be reversed absent a showing of abuse of discretion. Id. Under the circumstances of this case, we cannot conclude that the trial court abused its discretion in failing to grant the motion for continuance.

{¶ 42} We also note that counsel for Thomas presented no objection during the hearing to the testimony of Dr. Moomaw, the court-appointed medical expert, nor does Thomas assert that any prejudice resulted from his testimony. Presumably, where the court, rather than the parties, appoints a medical expert, the testimony provided by the expert will be impartial and independent. Here, there is nothing in the record to suggest that Dr. Moomaw was not independent or that his opinion was biased. Moreover, the report of Thomas's own examining physician, Dr. Evans, contained no evidence contradicting the opinion of Dr. Moomaw that Thomas presently suffered from dementia and that she met the statutory definition of an incompetent. Finally, there is no indication that the trial court would have precluded the testimony of Dr. Evans at the guardianship hearing.

{¶ 43} Based upon the foregoing, the first assignment of error of Thomas is without merit and is overruled.

{¶ 44} The second and third assignments of error of Thomas are interrelated and will be discussed together. Under the second assignment of error, Thomas

contends that the trial court's failure to entertain any of the less restrictive alternatives presented at the hearing constituted error and was against the manifest weight of the evidence. Under the third assignment of error, Thomas asserts that the trial court erred in finding that a guardianship was necessary.

{¶ 45} In *In re Guardianship of Stokes* (Jan. 30, 1997), Cuyahoga App. No. 70666, 1997 WL 37686, the court noted:

{¶ 46} "In determining whether a judgment is against the manifest weight of the evidence, a court of appeals must be guided by the presumption that the findings of the trier-of-fact were indeed correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80 [10 OBR 408, 461 N.E.2d 1273]. The court explained:

{¶ 47} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

{¶ 48} "Thus, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. Id. * * *"

{¶ 49} In general, a probate court is given broad discretion in matters involving the appointment of a guardian. *Davis v. Cuyahoga Cty. Adult Protective Serv.* (Oct. 12, 2000), Cuyahoga App. No. 77116, 2000 WL 1513752. Under R.C. 2111.02(A), the probate court is permitted to appoint a guardian of the person, of the estate, or of both for an incompetent person. R.C. 2111.02(C) sets forth the procedure to be followed before a guardian may be appointed, including a provision for a hearing, and in such a hearing concerning the appointment of a guardian, a finding of incompetency must be established "by clear and convincing evidence." R.C. 2111.02(C)(3). Further, the probate court is to consider "evidence of a less restrictive alternative if it is introduced at the hearing and may deny a guardianship if it finds that a less restrictive alternative exists." *Davis,* supra.

{¶ 50} R.C. 2111.01(D) defines "incompetent" as follows:

{¶ 51} " 'Incompetent' means any person who is so mentally impaired as a result of a mental or physical illness or disability, or mental retardation, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property or fails to provide for the person's family or other persons for whom the person is charged by law to provide, or any person confined to a correctional institution within this state."

{¶ 52} At the hearing on the issue of incompetency, applicant Randall, an attorney, testified that, in the summer of 2000, he was appointed guardian over Roy Thomas. Prior to his death in December 2000, Roy Thomas was hospitalized, and Randall routinely would call Eloise Thomas to inform her about different medications or medical procedures involving her husband. However, "the next day," Randall would receive a call from her asking "why I didn't call her and tell her about the new procedures." Based upon his own personal phone calls with Thomas, Randall "had concerns with her forgetfulness."

{¶ 53} Randall also had concerns regarding Thomas's competence to manage her affairs. Randall recalled a meeting with Thomas's attorneys in which it was discovered that "a Mike Bowers had somehow convinced Eloise to give him $35,000 for the purchase of a car, at that meeting Eloise didn't know why she had done it and wanted to rescind the transaction."

{¶ 54} Dr. Ronald C. Moomaw is board-certified in psychiatry. On February 15, 2000, Dr. Moomaw evaluated Thomas. According to Dr. Moomaw, there are three levels of dementia: severe, moderate and mild. Based upon his examination, Dr. Moomaw concluded that Thomas suffers from "moderate dementia," and that the condition affects her motor behavior, memory, concentration, judgment and perception of time and place. Thomas scored "17 of a possible 30" on the Mini Mental Status Exam ("MMSE").

{¶ 55} According to Dr. Moomaw, Thomas "has a great deal of difficulty with her memory and she relies on others and other cues in order to understand what is normally in a person's recent and long-term memory." Thomas had difficulty remembering her age, the date or month of her husband's death, the number of brothers and sisters in her family, or the date of her recent marriage to Jenkins. Thomas was uncertain as to when she and her husband won the lottery, and she had no real understanding of her financial assets, and "no concern about the money whatsoever." She also "did not have a good understanding of her medication." Dr. Moomaw stated that Thomas demonstrated poor judgment and, in his opinion, she is vulnerable.

{¶ 56} Thomas also displayed a limited ability to think abstractly, and she was unable to explain the difference between a bowl and a hat. During the examination, Thomas "wasn't able to venture a guess" as to how old she was. Dr. Moomaw believed that Thomas would have difficulty making decisions about where she should live, and that she would not be able to make informed decisions concerning finances. Regarding decisions about her medical care, Dr. Moomaw stated that, "[i]f given the information and not allowing a lot of time to pass, she would be able to make appropriate decisions concerning her care at the moment."

{¶ 57} According to Dr. Moomaw, Thomas met the statutory definition of an incompetent. As to a prognosis, Dr. Moomaw stated that "[d]ementias like this

have a progressive course, you do not see remissions, * * * they don't repair." Based upon his evaluation, Dr. Moomaw opined that Thomas would not improve in the future.

{¶ 58}　Janet Ringley, a trust officer with National City Bank, testified that Thomas has a trust instrument on file with the bank.　At trial, Ringley identified a letter from the secretary of the Leroy Jenkins Evangelistic Association addressed to Ringley, requesting reimbursement for certain items.　One of the requests was for the amount of $12,000 to be paid to the Leroy Jenkins Evangelistic Association for lodging expenses for Mary Drakeford and Thomas "for the months of November and December in the Miracle House, a licensed bed and breakfast facility."　Ringley testified that the items requested had not been paid out of the trust.

{¶ 59}　Ringley was also shown a printout of charges made on a Visa card in Thomas's name.　The card was applied for in December 2000, and Ringley was unaware of any other charge cards in Thomas's name prior to the issuance of that card.　There were a number of charges processed, including a charge for $1,214.90 to S&K Famous Brands on January 6, 2001;　charges of $826 and $2,745.62 on January 10 and 11, 2001, to the Saddlebrook Resort in Tampa, Florida;　and a charge of $108.94 made on January 13, 2001, to the MGM Grand Hotel in Las Vegas, Nevada.　Ringley testified that various amounts had been debited from Thomas's savings account, including $4,000 on November 14, 2000; $1,000 on November 10, 2000;　$10,000 on November 20, 2000;　$3,000 on December 11, 2000;　and $14,000 on December 30, 2000.　The amount of $10,000 debited on November 20, 2000, was issued in a cashier's check to "Healing Waters."　On November 24, 2000, the amount of $35,536.21 was withdrawn from a certificate of deposit.

{¶ 60}　Reverend Jenkins was called to testify on cross-examination.　Jenkins, president of the Leroy Jenkins Evangelistic Association, testified that he first met Thomas thirty-two years ago.　After their initial meeting, Thomas eventually began attending Jenkins's church.　According to Jenkins, he married Thomas "because I promised her husband that I'd take care of her."　He stated that they decided to get married shortly after the death of Roy Thomas "[w]hen we found out that things had—they had frozen her bank account and was trying to take guardianship over her."　Upon discovering that a guardianship application had been filed, "[i]t changed [our plans] from going to Florida on a vacation to Las Vegas to get married."

{¶ 61}　Jenkins stated that he initially had a cordial relationship with Thomas's sister, Mary Drakeford, but he subsequently heard Drakeford warn Thomas that " '[t]hat white man is going to take all of your money.' "　Jenkins stated that Thomas paid for housekeepers at the Delaware residence "[b]ecause the attor-

neys had told her that she needed to spend some money because otherwise she would have to pay a lot of taxes." Jenkins further stated that Thomas was being well cared for at his residence and that it would not be in her best interest to be removed from his care.

{¶ 62} Josephine Foster, a niece of Thomas, resides in Spartanburg, South Carolina. Jenkins once told Foster that he was going to tell Thomas to "give me [Thomas's] house because he was sure that she would do whatever he tell [sic] her." Around the time of the funeral of Roy Thomas, Jenkins "started teasing us about he was going to marry [Thomas]."

{¶ 63} Brodman Drakeman, a nephew of Thomas, testified that, in 1992, he visited Roy Thomas in a hospital. During the visit, Jenkins arrived at the hospital and Drakeman heard Jenkins state, " 'If the Thomases don't have $2 million for me, then they're wasting my time.' " Drakeman was present when Thomas signed a power of attorney in November 2000. Drakeman was "not sure" if his aunt realized the import of the power of attorney when she signed the document because she "acted confused."

{¶ 64} Drakeford, Thomas's sister, first met Jenkins in October 2000. Drakeford's niece, Josephine Foster, had asked Drakeford to come to Columbus to help care for Thomas, who had been ill. Drakeford lived at Thomas's house in Columbus for approximately three or four weeks to assist Thomas.

{¶ 65} Approximately a week before Thanksgiving, upon the suggestion of Jenkins, Thomas and Drakeford went to stay at Jenkins's residence in Delaware. In January 2001, Drakeford, Thomas, and Jenkins made plans to go on a trip to Florida to see a doctor. Drakeford made arrangements to drive with another individual, while Thomas and Jenkins planned to fly there. Drakeford subsequently learned that Thomas and Jenkins were in Las Vegas. Drakeford, who was unsuccessful in trying to contact Thomas at this time, contacted the police when she discovered that her sister was missing.

{¶ 66} Drakeford testified that she did not believe it was in Thomas's best interest to remain in the care of Jenkins. According to Drakeford, Jenkins would tell Thomas "how to talk and what to say." Drakeford related an incident in which "this fellow that had worked for Leroy, or a friend of Leroy's or something, he had taken [Thomas] to the bank and had her * * * draw out $45,000 [sic] and bought a car." According to Drakeford, "[t]he lawyers talked to her and tried to get her to try to get the money back, but she didn't seem to care."

{¶ 67} On November 28, 2000, Drakeford met at the office of an attorney regarding a durable power-of-attorney. Both Drakeford and Jenkins signed the power-of-attorney as joint attorneys-in-fact. At the time she signed the document, Drakeford was concerned about the physical and mental condition of

Thomas. Drakeford related that she would help Thomas with her medication because Thomas "would get mixed up, she would pour it all out, different bottles, sometimes get it mixed up." Drakeford testified that, "I don't think she's aware of what's really happening." Drakeford did not believe it was a good idea for Jenkins to be designated as one of the attorneys-in-fact. Drakeford stated that she never used the power of attorney on behalf of her sister because Jenkins "was always doing it."

{¶ 68} Timothy Holmes is an acquaintance of Thomas, and he visited Thomas several times at the residence of Jenkins in Delaware. Holmes testified that Thomas appeared confused at times. He stated that "people weren't telling her exactly why and where she had to go, and she exhibited [confusion] by asking questions over and over, 'Why am I doing this?' 'Why am I doing that?' " Holmes did not believe that Thomas voluntarily married Jenkins.

{¶ 69} Delaware Police Captain Mark Drum was called as a witness on behalf of Thomas. Drum spoke with Thomas after she returned from her trip to Las Vegas in January 2001. Thomas told Drum that she enjoyed residing at Jenkins's residence in Delaware. Thomas indicated that she was "concerned that her family was out after her money." Drum did not have any reason to believe that Thomas was unsafe at Jenkins's residence. Drum was not surprised that Thomas was diagnosed with moderate dementia. He stated that, "there were some things that she couldn't recall. Some things she remembered very good, * * * but * * * there were some things she plain forgets."

{¶ 70} Deborah Hargrave–Turner also testified on behalf of Thomas. Hargrave–Turner was a former neighbor of Thomas when Thomas resided on Cooke Road. Hargrave–Turner testified that Thomas had "much admiration" for Jenkins and that she trusted him. Hargrave–Turner stated that she was not surprised to learn that Jenkins and Thomas were married following the death of Roy Thomas. According to Hargrave–Turner, Thomas did not have a good relationship with her sister, Mary Drakeford. Hargrave–Turner visited Thomas in Delaware and stated that Thomas was happy to be living there. Hargrave–Turner also stated that Thomas had gained weight since the last time she had visited with her.

{¶ 71} In its decision finding that Thomas was incompetent and in need of a guardian, the court made the following findings:

{¶ 72} "Dr. Moomaw testified that Eloise suffers from moderate dementia. Dr. Moomaw also noted that she lacks the ability to think abstractly, lacks concentration, and has significant deficits of memory. His observations were substantiated with the clinical interview and the MMSE, in which Eloise scored 17 out of a possible 30. His uncontroverted testimony to the Court concluded that with a reasonable degree of medical certainty, Eloise fit the statutory

definition of incompetent. Additionally, Mr. Horvath's report indicated that Eloise was forgetful and disoriented at times, and that her concentration was impaired. His report indicated that she was unable to recall significant aspects of her life. Additionally, Eloise did not know how much money she had in the bank or in which bank her money was located.

{¶ 73} "Based on the testimony of Dr. Moomaw and the findings by Mr. Horvath, the Court finds, by clear and convincing evidence, that Eloise is incompetent.

{¶ 74} "* * *

{¶ 75} "In his closing, Barry Waller suggested the Court consider less restrictive alternatives to a guardianship. He suggested the Court allow Eloise's assets to be transferred to an existing revocable inter vivos trust. He also suggested that she remain at Healing Waters and allow adult protective services to monitor her activities. The Court concludes [that] neither of these options [is] a viable alternative to a guardianship. A guardian is necessary. As a result of Eloise's incompetence she is vulnerable to undue influence and exploitation. Dr. Moomaw's conclusions are corroborated by the evidence. Subsequent to moving into the Jenkins residence, in excess of Seventy Thousand Dollars ($70,000.00) was credited or withdrawn from her National City Bank accounts in less than two (2) months. It was inferred from the testimony and, it is the belief of this Court that the spending habits of the Thomas' were nowhere near this figure.

{¶ 76} "As a result of Eloise's wealth, it appears Jenkins has attempted to gain a proprietary interest in Eloise's affairs as evidenced by his stealth marriage to Eloise, referring all Eloise's matters to his attorney, and having Eloise execute a Power of Attorney nominating him as co-attorney-in-fact. Interestingly, the Power of Attorney was executed the same day a letter was written stating the Thomas's [sic] were subject to undue influence. The attorney who wrote the letter also witnessed and notarized the Power of Attorney.

{¶ 77} "The Court concludes that Jenkins has attempted to cloister Eloise from her family and friends, control her activities and monitor her conversations. For these reasons the Court finds [it is] not in Eloise's best interest to remain in the Jenkins residence."

{¶ 78} Upon review of the testimony as outlined above, we conclude that the evidence presented to the probate court clearly and convincingly showed that Thomas was an incompetent person within the contemplation of R.C. 2111.01. The uncontroverted testimony at the hearing established that Thomas suffers from moderate dementia, a condition that has affected her memory, concentration, comprehension, judgment, and perception of time and place. The evidence supports the trial court's finding that her condition has progressed such that she

is incapable of managing her financial affairs, and that she is vulnerable to undue influence. Dr. Moomaw opined that she was unable to make informed decisions regarding financial matters, and there was evidence suggesting that designing persons had already taken advantage of Thomas. Dr. Moomaw also stated that Thomas lacked a good understanding as to her medication. According to Dr. Moomaw, Thomas's condition was progressive and would not improve over time. Based upon clear and convincing evidence that Thomas was incompetent and in need of a guardian, we reject Thomas's contention that the trial court erred in finding that a guardianship was necessary.

{¶ 79} On the issue of less restrictive alternatives, the record indicates that counsel for Thomas suggested two alternatives to guardianship. Concerning Thomas's financial assets, counsel argued that all of her assets could be placed in a preexisting inter vivos trust. As to the issue of whether a guardianship of Thomas's person was necessary, counsel argued that the evidence indicated that Thomas "is doing well, is happy, eating well living * * * with Reverend Jenkins up in Delaware, Ohio."

{¶ 80} The trial court found neither of the two proposed options to be a viable alternative to appointment of a guardian. Regarding the option of placing all of Thomas's assets into a preexisting inter vivos trust, the court expressed concern that, as a result of Thomas's incompetence, she was vulnerable to undue influence and exploitation. Upon review, we conclude that the trial court could have reasonably determined that the terms of the preexisting trust were insufficient to provide the type of protection of Thomas's assets that the appointment of a guardian would provide.

{¶ 81} As to the option of having Thomas remain in the care of Jenkins at his residence, it is clear that the court had serious concerns that Jenkins had attempted to exert influence over Thomas because of her substantial wealth, and that the court did not deem it in the ward's best interests to remain at the residence of Jenkins where she might be vulnerable to Jenkins and other individuals. The record supports the trial court's finding that significant amounts of expenditures were made from Thomas's assets during the time that she was under the care of Jenkins, including thousands of dollars Thomas apparently provided to an individual to purchase an automobile. Although Jenkins denied that this individual was a confidant of his, there was other evidence before the trial court indicating that this person worked for Jenkins, and that he had driven Thomas to the office of the attorney when the power of attorney was signed. The trial court had the opportunity to observe the demeanor and attitude of the witnesses at the hearing, including Jenkins, and the court's finding that it would not be in Thomas's best interests to remain in the care of Jenkins at his residence is not against the manifest weight of the evidence. Accordingly, we conclude that

the trial court was within its discretion in declining to find that the proposed alternatives were more appropriate than a guardianship.

{¶ 82} Based upon the foregoing, the second and third assignments of error of Thomas are without merit and are overruled.

{¶ 83} We will next address the assignments of error raised by appellant Jenkins. Under his first assignment of error, Jenkins asserts that the trial court erred when it revoked the durable power of attorney executed by Thomas in November 2000. Specifically, Jenkins contends that the trial court erroneously found, by revoking the power of attorney, that Thomas was incompetent at the time she executed the document on November 28, 2000. Jenkins further asserts that it was beyond the scope of the trial court's authority to revoke the power of attorney, because no party had filed any petition or motion seeking its revocation.

{¶ 84} In response, appellee argues that the trial court did not hold that Thomas was incompetent during November 2000 or that the power of attorney was invalid. Rather, appellee asserts that the trial court, upon finding that Thomas was presently incompetent, exercised the power Thomas had retained to revoke the power of attorney, and that such action was within the court's statutory authority.

{¶ 85} We agree with appellee's contention that the decision of the trial court did not contain a finding that Thomas was incompetent at the time she executed the power of attorney. Thus, the issue is whether the court's decision to revoke the power of attorney can be supported as an exercise of its authority in matters involving guardianships.

{¶ 86} In this regard, R.C. 2111.50(A)(1) provides, in part, that, "[a]t all times, the probate court is the superior guardian of wards who are subject to its jurisdiction." R.C. 2101.24(A)(1)(e) grants the probate court the authority "[t]o appoint and remove guardians, conservators, and testamentary trustees, direct and control their conduct, and settle their accounts." The court also has, subject to certain enumerated exceptions, "all the powers that relate to the person and estate of the person and that he could exercise if present and not * * * under a disability, except the power to make or revoke a will." R.C. 2111.50(B). In addition to its exclusive jurisdiction, R.C. 2101.24(B)(1)(b) provides that the probate court has concurrent jurisdiction with the general division of the court of common pleas to hear and determine any action that involves "a power of attorney, including, but not limited to, a durable power of attorney."

{¶ 87} Ohio courts have noted that "a power of attorney may be revoked by the principal." *Smith v. Flaggs* (Oct. 29, 1998), Cuyahoga App. No. 74414, 1998 WL 774664. See, also, *Alliance First Natl. Bank v. Spies* (1953), 158 Ohio St. 499, 502, 49 O.O. 446, 110 N.E.2d 483 (where principal grants authority to another

under warrant of attorney, "the authority so granted may be revoked at any time"). Further, R.C. 1337.09 provides that if a guardian is appointed for the principal, "[t]he guardian has the same power the principal would have had if not incompetent, to revoke all or any part of the power and authority of the attorney in fact." Thus, while a durable power of attorney survives the incapacity of the principal, Ohio law provides that a guardian has the same power to revoke the power and authority of the attorney in fact that the principal would have had if the principal were not incompetent. In the present case, the record reflects that the trial court revoked the power of attorney while acting in its role as the superior guardian of the ward and, in so doing, the court assumed no greater rights than Thomas would have been able to exercise if she had been competent. Accordingly, we reject Jenkins's contention that the trial court was without authority to revoke the power of attorney.

{¶ 88} Based upon the foregoing, the first assignment of error of Jenkins is without merit and is overruled.

■ {¶ 89} Under the second assignment of error, Jenkins asserts that the trial court erred in admitting a November 28, 2000 letter into evidence and in barring the testimony of appellant's witnesses relating to the competency of Thomas on November 28, 2000, the date Thomas executed the durable power of attorney. The arguments raised under this assignment of error relate to the contention by Jenkins that the trial court erred in finding that Thomas was incompetent to execute the power of attorney on November 28, 2000. As discussed above, however, the trial court's decision to revoke the power of attorney was not predicated upon a finding that Thomas was incompetent on that date. Accordingly, based upon our disposition of Jenkins's first assignment of error, the issues raised under his second assignment of error are rendered moot.

■ {¶ 90} Under his third assignment of error, Jenkins contends that the trial court erred in revoking his application for guardianship over the person of Thomas only. Jenkins contends that, because he did not seek guardianship over the estate of Thomas, the trial court had no basis to deny the application. Jenkins also contends that the durable power of attorney named him as a co-guardian, and the trial court failed to make a finding whether Jenkins was competent, suitable, and willing to serve as guardian under R.C. 2111.121(B).

{¶ 91} R.C. 2111.121(B), the statute relied upon by Jenkins, states in part:

{¶ 92} "If a person has nominated * * * in a durable power of attorney * * * another person to be the guardian of the nominator's person, estate, or both, and proceedings for the appointment of a guardian for the person are commenced at a later time, the court involved shall appoint the person nominated as guardian in

the writing or durable power of attorney most recently executed if the person nominated is competent, suitable, and willing to accept the appointment. * * *"

{¶ 93} At the outset, as noted by appellee, Thomas did not nominate Jenkins to serve as the sole guardian of her person, as now sought by Jenkins. Rather, the durable power of attorney provided for the nomination of Jenkins and Drakeford as co-guardians.

{¶ 94} More significantly, R.C. 2111.121(B) provides that the court shall appoint the person nominated as guardian under a durable power of attorney only if the individual so nominated is "competent, suitable, and willing to accept the appointment." Jenkins contends that, because he sought guardianship only over the person of Thomas rather than her estate, the trial court's concerns that Jenkins had taken improper actions regarding the financial assets of Thomas did not provide a basis for the court to deny him guardianship. Jenkins cites no authority for this proposition and we find this argument to be unpersuasive. As noted by appellee, Ohio courts have held that evidence of financial misconduct is relevant to the issue of suitability for guardianship. See *In re Tutt* (Aug. 31, 2000), Cuyahoga App. No. 77028, 2000 WL 1231477 (probate court did not err in failing to appoint daughter of ward as guardian of ward's person where court cited evidence of financial irregularities, including evidence of $20,000 being wrongfully withdrawn from ward's bank account); *In re Guardianship of Hafner* (Nov. 24, 1993), Summit App. No. C.A. 16073, 1993 WL 498365 (even though son was nominated to be guardian for mother under durable power of attorney, potential for lawsuit against son regarding monies he expended by power of attorney supported court's determination of his unsuitability for appointment as guardian of his mother's person or estate).

{¶ 95} We have previously discussed, in addressing the second and third assignments of error of Thomas, the trial court's findings concerning actions taken by Jenkins in relation to Thomas. The trial court's decision included findings that Jenkins had attempted to gain a proprietary interest in the affairs of Thomas by means of arranging a stealth marriage to her, referring all her matters to his attorney, having Thomas execute the power of attorney naming him as co-attorney-in-fact, attempting to cloister Thomas from her family and friends, and controlling her activities and monitoring her conversations. We have also previously discussed evidence of significant amounts withdrawn from Thomas's various accounts after she moved into the residence of Jenkins.

{¶ 96} In making a determination as to who should serve as a guardian, the probate court's primary responsibility is to ensure that the person appointed will act in the best interests of the ward. *In re Guardianship of Friend* (Dec. 16, 1993), Cuyahoga App. No. 64018, 1993 WL 526643. The record in this case contains evidence by which the probate court could have concluded that previous

actions taken by Jenkins were contrary to the best interests of Thomas and that Jenkins was therefore unsuitable to serve as guardian of her person. Accordingly, the probate court did not abuse its discretion in finding that the appointment of a third party as guardian of Thomas was in her best interests. Further, the fact that the trial court did not make a specific finding in accordance with R.C. 2111.121 is without merit. See *Hafner*, supra (determination of unsuitability of individual nominated to be guardian under power of attorney was evident from record and no specific finding under R.C. 2111.121 was required).

{¶ 97} The third assignment of error of Jenkins is not well taken and is overruled.

{¶ 98} Based upon the foregoing, the first, second, and third assignments of error of appellant Thomas are overruled, the first and third assignments of error of appellant Jenkins are overruled, and the second assignment of error of Jenkins is rendered moot. The judgment of the Franklin County Court of Common Pleas, Probate Division, is hereby affirmed.

Judgment affirmed.

BOWMAN and PEGGY BRYANT, JJ., concur.